UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-21746-CIV-MORENO/GOODMAN

NATIONAL EQUESTRIAN LEAGUE, LLC, et al.,

     Plaintiffs,

v.

KEEAN WHITE, et al.,

     Defendants.

_____/

REPORT AND RECOMMENDATIONS ON DEFENDANTS'
MOTION TO DISMISS AMENDED COMPLAINT

Plaintiffs, National Equestrian League, LLC ("NEL") and JumpingClash, S.I. ("JC"), filed an amended complaint against Defendants, alleging copyright infringement, breach of contract, fraud, negligent misrepresentation, tortious interference, conspiracy, breach of fiduciary duty, theft of trade secrets, unjust enrichment, and FDUTPA claims arising from Defendants' acting as consultants to Plaintiffs in the formation of Plaintiffs' professional horse jumping league. [ECF No. 45].

Defendants filed a motion to dismiss the following counts: Count I (copyright infringement), Count V (fraud), Count VI (negligent misrepresentation), Count VIII (conspiracy), Count XII (unjust enrichment), and Count XIII (copyright infringement).

[ECF No. 50].[1] Plaintiffs filed a response in opposition, and Defendants filed a reply. [ECF Nos. 54; 57]. United States District Judge Federico A. Moreno referred to the Undersigned all rulings on pretrial, non-dispositive matters and a Report and Recommendations on all dispositive matters. [ECF No. 30].

For the reasons discussed below, the Undersigned **respectfully recommends** that the District Court **deny in large part** Defendants' motion to dismiss Plaintiffs' amended complaint. Specifically, the Undersigned **respectfully recommends** that the District Court **deny** the motion to dismiss as to: Count I (copyright infringement), Count V (fraud), Count VI (negligent misrepresentation), Count VIII (conspiracy), Count XII (unjust enrichment), and Count XIII (copyright infringement). The Undersigned **respectfully recommends** that the District Court **grant** Defendants' motion to dismiss, as follows: (1) striking Plaintiffs' requests for disgorgement of profits in their breach of contract claims; (2) striking Plaintiffs' request for damages other than actual damages, infringer profits, and costs for copyright infringement; and (3) striking Plaintiffs' request for damages other than actual damages, plus attorney's fees and court costs for the FDUTPA claim.

---

[1]      Defendants initially moved to dismiss Count IX (Breach of Fiduciary Duty) [ECF No. 50], but later withdrew their motion to dismiss this count in their reply. [ECF No. 57].

I.      **Background**

On April 27, 2020, Plaintiffs filed their eight-count complaint against Defendants. [ECF No. 1]. Defendants filed a motion to dismiss all eight counts of the complaint, which was referred to the Undersigned. [ECF No. 6]. The Undersigned entered a Report and Recommendations recommending that Count III (Breach of Contract against MMG), Count V (Fraud against all Defendants), Count VI (Negligent Misrepresentation against MMG, Angelstone, Morrissey, and White), and Count VIII (Conspiracy against all Defendants) be dismissed with leave to amend; and the motion to dismiss be denied as to: Count I (Copyright Infringement against all Defendants), Count II (Breach of Contract against Angelstone), Count IV (Breach of Contract against Morrissey), and Count VII (Tortious Interference against all Defendants). [ECF No. 38].

Before Judge Moreno ruled on the parties' objections, Plaintiffs moved to file an amended complaint, which was granted. [ECF Nos. 42; 44]. Plaintiffs filed an amended complaint including six new counts and pleading additional details relating to the previously pled eight counts. [ECF No. 45].

Plaintiffs include the following general allegations, which are incorporated to all the counts:

> 12. For years JC has been developing a concept and plan to launch a professional horse jumping league called the National Equestrian League (the "NEL"). The plan to develop and promote the NEL shall be referred to herein as the "NEL Plan." JC set out to create the "NFL of Equestrianism," with teams of the best horses and riders competing in America's top venues.

Among other things, the NEL Plan includes sponsorships, advertising, television coverage and equipment sales.

13. JC owns by assignment the rights to a copyright in the Jumping Clash Show Jumping Competition Modality and Format ("Competition Modality and Format"). The Copyright registration number is TXu001789936. The Competition Modality and Format includes a description of the competitive system, innovations, betting, examples of competitions in the JC system, logos, and other information.

14. JC also owns the rights to a copyright in the National Equestrian League Presentation ("League Presentation'). The Copyright registration number is TXu2236041. The League Presentation includes a description of the NEL and its plans.

15. JC owns the rights to a copyright in the National Equestrian League Executive Summary ("Executive Summary"). The Copyright registration number is TXu2235322. Executive Summary includes a description of the NEL and its formats.

16. JC also owns the rights to a copyright in the National Equestrian League Franchise Summary ("Franchise Summary"). The Copyright registration number is TXu2237874. The Franchise Summary includes a description of the NEL and its formats.

17. JC has expended years of activity and significant sums of money to develop the NEL Plan. After analyzing the issues extensively and investing much time and money for strategic consulting, JC determined that North America was a viable market in which to develop and launch the new format for team competition.

18. JC formed National to assist in planning, developing, promoting and operating the NEL Plan in North America.

19. In or around July 2017, JC met with MMG, Morrissey and Nicky Meyer ("Meyer"). At the meeting, representatives for JC presented the concept of the NEL Plan. Morrissey and Meyer loved the project and expressed an interest in being part of it. They agreed that MMG would begin working for JC after JC obtained approval from the Federation Equestre Internationale ("FEI").

20. As part of its efforts to develop and promote the NEL Plan, in 2017, JC successfully secured FEI approval of the JumpingClash rules which form the foundation of the NEL. Obtaining FEI approval was a detailed and time[-]consuming process, requiring extensive work, knowhow, and development of the horse jumping league concept and business plans.

. . .

25. After numerous meetings, JC and MMG entered into a contract, attached as Exhibit C hereto.

26. The contract was "to provide consulting and management services" for National.  Ex. C, Annex. . .

27. MMG's team included Defendant Morrissey, as well Michael Morrissey, the president of MMG, and Nicky Meyer. Ex. C, Annex.

. . .

33. MMG and Morrissey became JC's image promotor and representative within the North American equestrian industry. MMG's main task was to contact the main stakeholders in the market and act as the intermediary between JC and these stakeholders.

34. By agreement of the parties, MMG continued to work pursuant to the contract at all relevant times.

35. Despite being experts at event promotions, MMG and Morrissey sabotaged the NEL Plan by failing to share necessary information about it, including, without limitation to the relevant potential investors, venues, potential sponsors, and key stakeholder groups. This led to wasted time and resources and required retention of an additional consultant.

36. MMG and Morrissey also sabotaged the NEL Plan by unilaterally canceling event dates in January 2020, at about the same time that MMG, Morrissey, White and Angelstone formed Major League, launching their own league based on the NEL Plan.

37. MMG's actions resulted in event cancellation fees and damaged NEL's reputation, making it more difficult in the future for the NEL to book dates and make deals in the horse jumping community.

38. Under its agreement with JC, MMG was to engage with and negotiate with all event promotors that might be attractive for NEL. Despite many expressions of interest and the attractive economic proposal provided by JC, MMG never successfully obtained a contract with even a single promotor. At the time, it was confusing to Plaintiffs, but given later events, the reason for MMG's failure to obtain contracts for the NEL has become clear as Morrissey, MMG, White and Angelstone have launched their own competing league, using as a framework the NEL Plan that JC developed at such great expense and personal sacrifice.

39. In order to facilitate MMG's work, JC opened up all its research and analysis and shared with MMG, Morrisey, White and Angelstone its entire strategy, collaboration proposals, business plans, sales reports for investors, regulations, television format proposals, media strategy, image, team value proposals, business model developments, systems for licensing and franchising, and other aspects of the NEL Plan. Plaintiffs also promoted MMG's image by including MMG's brand and professional profile on the NEL website.

40. MMG also worked to set event dates with the FEI, the United States Equestrian Federation ("USEF"), and Equestrian Canada. MMG performed poorly, underestimating the expense of bookings and taking much longer than necessary. MMG also induced JC to allow MMG to book the times in its own name instead of for NEL.

41. MMG's mishandling of the bookings created problems for the launch of NEL

. . .

42. At a meeting in Florida, MMG introduced JC to White as a possible collaborator in two areas.

43. White loved the NEL's concept and stated it would be a great fit for his company and venue.

44. White promised that he would collaborate in organizing an event in Canada and act as a manager for team sales.

45. White also worked to co-organize a possible event with the NEL to be held in Toronto, for which he charged a monthly fee to National.

46. White was provided with all the details of the NEL Plan.

47. White worked to promote the NEL with potential teams.

48. National and White's company, Angelstone, entered into a Collaboration Agreement, attached as Exhibit A hereto.

49. The purpose of the Collaboration Agreement was to retain Angelstone and White as consultants for the NEL project and to identify persons to acquire teams for the NEL. Its duration was from August 30, 2019 through December 31, 2020.

50. The agreement stated that National "is interested in identifying persons to acquire NEL Teams to be part of the Series and competing in the new series."

51. Angelstone promised to "supply the NEL the Services described as set out in this Agreement."

52. The Collaboration Agreement further provided the "Services that the Consultant shall provide in favor of NEL shall include all the reasonably necessary information, resources and efforts in order to help NEL to accomplish the Project."

. . .

54. National and Angelstone also entered into a consultancy agreement for an event in Toronto (the "Toronto Consultancy Agreement"), attached as Exhibit D hereto.

. . .

56. Anglestone also agreed to provide services, including assistance with negotiations, promotions and public relations, obtaining sponsors, and setting up competitions.

57. In their roles as consultants, Defendants obtained various proprietary and secret information from Plaintiffs.

58. This included the NEL Plan, business plans, costs, regulatory know-how, various contacts of potential investors, promoters, managers, sponsors, venues, potential event dates, event features and benefits, financial projections and economic scenarios, market analyses and research,

marketing and promotional plan, competition format, timetables, partners and teams, and their copyright protected materials.

59. Defendants used and disclosed this information in setting up their own league – called Major League Show Jumping (the "MLSJ"), organizing events, creating its rules, pitching teams, investors and sponsors and other activities.

60. MMG and Morrissey failed to provide the services they promised because they were not able to organize proper events in a timely fashion.

61. At relevant and important junctures in the project, White and Angelstone failed to present proper teams for consideration, instead trying to recruit individual riders into teams Defendants attempted to organize themselves. This also set back the project for Plaintiffs.

62. Later events would show that the Defendants were, in violation of their roles as paid consultants, withholding their efforts for obtaining investors, venues, teams, promotors and managers for NEL.

. . .

65. Morrisey and White, abusing their positions as consultants, sought to discourage Plaintiffs in their planning because they were secretly forming a competing league of their own that would include many, if not all, of the key components of NEL. Consequently, they did not offer alternatives that they believed would be successful.

66. In or around early December 2019, Defendants, acting by and through White and Morrisey, agreed to misappropriate, highjack and leverage the existing infrastructure of Plaintiffs and form their own competing horse jumping league, while keeping it secret and seeking to sabotage Plaintiffs' plans.

67. Morrissey and White falsely stated that they would continue working with Plaintiffs. Defendants did not indicate that they would misappropriate Plaintiffs' plans that Plaintiffs had labored so hard and invested so much to develop and set up their own league based on those misappropriations.

68. The NEL provides a novel means of competition, which is highly attractive to the world of horse jumping. Leveraging Plaintiffs' competition format and concepts, infrastructure, confidential information, ideas and

plans, as well as Plaintiffs' contacts, Defendants formulated an illicit plan to gain entr[y] into the horse jumping world.

69. On or around December 13, 2019, Plaintiffs and Morrisey and White again discussed future plans, and Defendants falsely agreed to continue working with Plaintiffs.

70. On or about December 16, 2019, White and Angelstone falsely stated in an email he would "absolutely" keep working with Defendants and not cancel their agreement. He punctuated his agreement by expressing his "sincerest gratitude and very best regards," although Defendants' secret plans were based on anything but gratitude and fond well wishes.

71. On December 21, 2019, White contacted Alfonso Romo, who had been identified as a potential investor and promotor for Plaintiffs. Defendants began negotiations with him over investing in a new league started by White and Morrissey, as well as event promotions for the new league. Romo eventually purchased an ownership interest in the MLSJ and helped promote an event to be held [in] San Miguel de Allende, Mexico as part of the MLSJ series.

. . .

73. By late December 2019, Defendants were already working on business plans for a new league.

74. Seeking to keep tabs on Plaintiffs' activities, Defendants began communicating directly and clandestinely with James Whisenand, a consultant and attorney for Plaintiffs, and the principal of a minor interest holder in National.

. . .

77. On December 29, 2019, at the same time Defendants were already working to form their own league and had already misappropriated Plaintiffs' trade secrets and prospects, Defendants contacted James Whisenand, and asked him for updates on Plaintiffs' plans. Morrissey and White agreed to keep what they were doing away from Whisenand.

78. In January 2020, Plaintiffs' representatives again met with Morrissey and agreed to the next steps regarding the relationship with Morrissey and MMG vis a vis the promotion and launch of NEL.

79. Plaintiffs' plans included a critical role for MMG and Morrissey.

80. Notwithstanding the ongoing efforts to execute the NEL Plan and discussions with Plaintiffs, Morrissey and MMG unilaterally cancelled event dates in January 2020 and did not notify Plaintiffs of such cancellations until almost three months after such cancellations were made.

81. While signaling further cooperation with Plaintiffs, Defendants worked to steal the NEL Plan, use Defendants' confidential information, regulatory knowhow, and business plans, infringe JC's copyrights, and set up their own league.

82. The MLSJ copies the main elements of NEL, including but not limited to three rounds taking place in one day, elimination of teams per round, inclusion of a jump off as final round, three riders per team in first round, two riders per team in second round, one rider per team in the jump off round, and a team manager.

. . .

88. Later in January 2020, again without informing Plaintiffs, Defendants contacted the USEF and requested that the licensee be changed from National to MMG. Defendants also requested that the organizer be changed from National to MMG and to not mention National.

89. Meanwhile, Defendants continued to contact Plaintiffs from January through March 2020 and discuss ongoing planning for the NEL with the Plaintiffs, and they did not mention that they were cancelling National's competition dates or setting up a new league.

. . .

96. On January 23, 2020, Defendants signed a venue agreement with Bromont, a venue in Quebec, Canada, which had been one of NEL's proposed venues.

. . .

101. Defendants falsely told the FEI in January or February 2020 that Plaintiffs were not going forward with their own plan.

10

102. By early February 2020, Defendants purported to have drafted rules for MLSJ and had signed 8 teams and were attempting to get approved by the FEI.

. . .

110. On March 13, 2020, when Plaintiffs sought to contact Morrisey to discuss launching NEL, they were informed by Morrisey that "when I did not hear from you back in February I assumed the project was given up." Defendants were still concealing from Plaintiffs that they had already cancelled the dates in early January 2020.

111. On or about March 13, 2020, Morrissey attempted to conceal his moves by claiming that he had not heard from Plaintiffs and had assumed that the NEL Plan was not going forward. Morrissey did not disclose that he had formed Major League and intended to use the NEL Plan to form his own league.

112. Defendants drafted a false letter to the USEF, but Plaintiffs did not approve the letter, and did not understand what the Defendants were attempting to do.

113. Finally, on March 26, 2020, apparently unable to hide the cancellations any longer, MMG informed Plaintiffs that it had cancelled the dates already.

114. The reason for Defendants' failures to execute on their agreements with Plaintiffs became clear in 2020 when Defendants went public with their intention to launch their own league modeled on the NEL Plan they had misappropriated.

. . .

119. Defendants contacted and have received commitments and/or contracts with teams, promotors, investors, sponsors, managers, potential partners, and venues, which Defendants learned about and/or promoted through working on the NEL Plan, and which they were contractually obligated to obtain for Plaintiffs. [Plaintiffs list the prospective partners and venues in paragraphs 121 and 122].

. . .

123. The impact of contacting these prospects for Defendants' new league caused the prospects not to do business with Plaintiffs.

124. Defendants likewise made additional breaches of their respective contracts by obtaining such teams, sponsors, investors, events and venues for MLSJ, not Plaintiffs.

[ECF No. 45, pp. 2-8].

Defendants filed a motion to dismiss the following counts: (1) Count I for copyright infringement of the "Competition Modality and Format" against all Defendants; (2) Count V for fraud against MMG, Angelstone, Morrissey, and White; (3) Count VI for negligent misrepresentation against MMG, Angelstone, Morrissey, and White; (4) Count VIII for conspiracy against all Defendants; (5) Count XII for unjust enrichment against all Defendants; and (6) Count XIII for copyright infringement of the "Executive Summary," "League Presentation," and "Franchise Summary" against all Defendants. [ECF No. 50].[2] The specific allegations for each count are discussed below in the analysis of each count.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that fails to state a cause of action for which relief may be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, the Court must accept the factual allegations

---

[2]    Although Plaintiffs filed a fourteen-count complaint and defendants move to dismiss only six counts, Defendants did not file a partial answer for the eight counts not subject to the dismissal motion, and Defendants did not file a motion to postpone the filing of their answer to the remaining counts. Plaintiffs, however, have not sought any relief flowing from this scenario.

as true and construe them broadly in the light most favorable to the plaintiff. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). When conducting this analysis, the Court may typically examine only the four corners of the complaint. *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). There are some exceptions to the "four corners" rule, but they are inapplicable here, with one exception: taking judicial notice of publicly filed copyright registration documents submitted as exhibits.

"To survive a motion to dismiss, a Complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]o survive a motion to dismiss, a plaintiff must do more than merely label his or her claims." *Afkhami v. Carnival Corp.*, 305 F. Supp. 2d 1308, 1325 (S.D. Fla. 2004) (citing *Blumel v. Mylander*, 919 F. Supp. 423, 425 (M.D. Fla. 1996)).

Additionally, a cause of action for fraud must satisfy Federal Rule of Civil Procedure 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake." A plaintiff must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Cardenas v. Toyota Motor Corp.*,

418 F. Supp. 3d 1090, 1098 (S.D. Fla. 2019) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997)).

"In other words, a plaintiff is required to plead the 'who, what, when, where, and how' pertaining to the underlying fraud." *Cardenas*, 418 F. Supp. 3d at 1098 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)).

**III.    Analysis**

**a.   Counts I and XIII – Copyright Infringement Against All Defendants**

In Count I, Plaintiffs allege that Defendants infringed their "Competition Modality and Format." [ECF No. 45, ¶¶ 127-40]. "The Competition Modality and Format includes a description of the competitive system, innovations, betting, examples of competitions in the JC system, logos, and other information." *Id.* at p. 3. According to Plaintiffs, the infringing work is substantially similar, if not identical, to the Competition Modality and Format and "Defendants copied the Format and Modality by copying the elements, including but not limited to the team format, team manager, number of rounds, and height of obstacles (1.45-1.50m)." *Id.* at ¶ 131.

In Count XIII, Plaintiffs allege that Defendants infringed the "Executive Summary," "League Presentation," and "Franchise Summary." *Id.* at ¶¶ 267-82. Specifically, Plaintiffs allege that Defendants "copied the Executive Summary by copying the elements, including but not limited to the competition format, teams are made up of a minimum of 5 and a maximum of 6 riders, three days of events, mandatory

participation requirement, and ten events across North America." *Id.* at ¶ 271. Plaintiffs

also allege that "Defendants copied the League Presentation by copying the elements,

including but not limited to using the franchise model, presenting MLSJ as a new league

to promote horse jumping in 'iconic' locations throughout North America, made for TV,

with the best riders on eight teams." *Id.* at ¶ 272. And they say that "Defendants copied

the Franchise Summary by copying the visual presentation, graphics, and elements of

NEL in their own MLSJ franchise presentation." *Id.* at ¶ 273.

To establish infringement, a copyright owner must prove "(1) ownership of a valid

copyright, and (2) copying of constituent elements of the work that are original." *BUC*

*Intern. Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007) (citation

omitted). "[C]opyright normally protects the expression of ideas, but not the ideas

themselves." *Id.* Copyright protection also extends to factual compilations. *Id.* at 1141.

"Even if all divisible elements of a work are filtered out as unprotected, the copyrighter's

selection and arrangement of otherwise unprotected elements can be protectable, if

original." *Parker v. Outdoor Channel Holdings*, No. 2-11-CV-00159-J, 2012 WL 6200177, at

*4 (N.D. Tex. Dec. 12, 2012) (internal citation omitted).

Defendants argue that Plaintiffs are seeking protection for a game concept or

athletic event that is not subject to copyright protection. *See* 17 U.S.C. § 102(b) ("In no case

does copyright protection for an original work of authorship extend to any idea,

procedure, process, system, method of operation, concept, principle, or discovery,

regardless of the form in which it is described, explained, illustrated or embodied in such work."); *see also Somerson v. McMahon*, 956 F. Supp. 2d 1345, 1353-54 (N.D. Ga. 2012) ("The Second Circuit has examined the issue of whether an athletic event is copyrightable and concluded that it is not. . . . The Court agrees with the Second Circuit's reasoning.").

But Defendants concede that the Franchise Summary containing visual presentation and graphics is protected by the Copyright Act.

Plaintiffs argue that Defendants' merit-based arguments are not appropriate at the motion to dismiss stage and that deciding these arguments would require the Court to conduct a fact-intensive comparison of each of Plaintiffs' works and compare it to Defendants' materials. Further, Plaintiffs argue that the constituent elements ("such as the one-on-one rider format, specific team composition, unique graphics and compilations, and presenting it as a franchise model in iconic locations throughout North America") are protected under the Copyright Act. [ECF No. 54, p. 16].

The Undersigned agrees with Plaintiffs. Plaintiffs have alleged infringement of their registered copyrights. Plaintiffs have pled sufficient facts to support the claim that Defendants have infringed on (at least some) of the constituent elements contained in the "Competition Modality and Format," "Executive Summary," "League Presentation," and "Franchise Summary."

Defendants are attempting to parse out portions of the "Competition Modality and Format," "Executive Summary," "League Presentation," and "Franchise Summary" as

16

not being protected constituent elements. While Defendants may be correct that some elements may not be protected (like the broad idea of a horse jumping competition), this Court should not undertake the fact-focused process of determining the merits of Plaintiffs' copyright claims on a motion to dismiss. *See, e.g., FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 679 F. Supp. 2d 312, 320 (E.D.N.Y. 2010) ("However, this determination of whether plaintiff's images are sufficiently original to be copyrighted is a factual issue that is inappropriate for determination on a motion to dismiss given the allegations in this case."); *Kumar v. Inst. of Elec. & Elecs. Engineers, Inc.*, No. CIV.A. 12-6870 KSH, 2013 WL 5467090, at *5 (D.N.J. Sept. 30, 2013) (rejecting defendant's merits-based arguments on motion to dismiss and noting that "the Court's task at this point is not to determine on the merits whether the Thesis contains only ideas and no expression. Rather the Court must assess whether Kumar's complaint provides sufficient factual information from which it may be reasonably inferred that the Institute trod on protectable grounds in publishing the Article.").

Defendants point to cases deciding the merits of copyright claims at the motion to dismiss stage that are relatively straightforward, unlike the merits determination that would be required here. *See Brandon v. New Power Generation*, No. 15-22738-CIV, 2017 WL 1437560, at *5 (S.D. Fla. Apr. 3, 2017) (finding that lyric "phone sex" is not copyrightable phrase on a motion to dismiss); *Total Mktg. Techs., Inc. v. Angel Medflight Worldwide Air Ambulance Servs., LLC*, No. 8:10-CV-2680-T-33TBM, 2012 WL 33150, at *5 (M.D. Fla. Jan.

17

6, 2012) (dismissing copyright claim because counter-plaintiff failed to allege all elements of statutory copyright infringement and counter-plaintiff sought protection for blank form, which is not entitled to copyright protection); *Taylor v. IBM*, 54 F. App'x 794, 794 (5th Cir. 2002) (deciding on motion to dismiss that there was no copyright protection for phrase "pre paid cash cards").[3]

Accordingly, the Undersigned finds that Defendants' motion to dismiss Counts I and XIII should be denied.

### b.  Count V – Fraud Against MMG, Angelstone, Morrissey, and White

Plaintiffs allege the following in support of their fraud count against MMG, Angelstone, Morrissey, and White:

> 167. As set forth in the General Allegations, MMG (through Morrisey and others), Angelstone (through White and others), Morrissey and White knowingly and intentionally made various false and fraudulent statements of material facts and omitted to state material facts to Plaintiffs.

> 168. While setting up and planning the MLSJ, as alleged above, Defendants made false statements in December 2019 through March 2020 that Defendants would continue working on the NEL Plan and toward the launch of the NEL, as well as seeking updates on Plaintiffs' work for the league.

---

[3]      Further, in support of their merit-based argument, Defendants cite to *Hoopla Sports and Entm't, Inc. v. Nike, Inc.*, 947 F. Supp. 347 (N.D. Ill. 1996) and *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997). In these cases, the plaintiffs sought copyright protection of live basketball games. Here, Plaintiffs argue that the constituent *elements* ("such as the one-on-one rider format, specific team composition, unique graphics and compilations, and presenting it as a franchise model in iconic locations throughout North America") are protected under the Copyright Act, not the *sport* of horse jumping itself.

169. As alleged above, Defendants also failed to disclose their plans for the MLSJ, their intention of ceasing to act as consultants for Plaintiffs, and that they had cancelled Plaintiffs' dates while under a duty to protect Plaintiffs' confidential information and business plans and to work on behalf of Plaintiffs.

170. Defendants intentionally made these false statements and failed to make disclosures to Plaintiffs to induce them to continue to work with Defendants under the agreements, to continue making payments, and to continue to disclose confidential information, knowhow, intellectual property, business plans and the NEL Plan to Defendants, as well as to forbear checking into Defendants' activities and to take counter-measures to prevent their contacts being signed up by Defendants.

171. In reliance on their false statements and omission, Plaintiffs continued to make such payments and disclosures and forbearances. Consequently, their reliance on these false statements and omissions have resulted in Plaintiffs' injury.

172. Defendants' fraud has actually and proximately caused substantial harm and damages to Plaintiffs.

[ECF No. 45, ¶¶ 167-172].

In evaluating Plaintiffs' first complaint, the Undersigned found that Plaintiffs failed to plead the "who, what, when, where, and how" of the fraudulent conduct that supported their claim. *See* ECF No. 38, p. 17 (citing *Cardenas*, 418 F. Supp. 3d at 1098). The Undersigned also found that Plaintiffs improperly comingled several defendants without providing specific facts supporting fraud as to each defendant. *See Rubinstein v. Keshet Inter Vivos Tr.*, No. 17-61019-CIV, 2018 WL 8899231, at *7 (S.D. Fla. Oct. 29, 2018), report and recommendation adopted, 2018 WL 8899306 (S.D. Fla. Nov. 15, 2018) ("Plaintiffs'

Florida RICO claim improperly commingles several defendants without providing any specific facts and therefore fails to meet Rule 9(b)'s particularity requirement.").

Defendants argue that Plaintiffs still do not allege fraud with the necessary particularity that is required under Fed. R. Civ. P. 9(b). Defendants state that the problems are "now compounded where there are twice as many paragraphs comprising the General Allegations of the Amended Complaint." [ECF No. 50, p. 7]. The Undersigned agrees that in some instances in the complaint, Plaintiffs still refer to the Defendants collectively and make vague references to false statements. However, Plaintiffs have amended the complaint to also provide the requisite who, what, when, where, and how of Defendants' alleged fraud, i.e., pretending to work as consultants for Plaintiffs while using that information to copy Plaintiffs' league and create their own league, and sabotaging Plaintiffs' league in the process.

Plaintiffs provide specific dates, refer to meetings and e-mail communications, and provide a detailed timeline of the alleged fraud. For example, Plaintiffs allege:

- On or about December 13, 2019, Morrisey and White "falsely agreed to continue working with Plaintiffs." [ECF No. 45, ¶ 69].

- "Morrissey and White falsely stated that they would continue working with Plaintiffs" when, in actuality, they planned to "misappropriate Plaintiffs' plans[.]" *Id.* at ¶ 67.

- "On January 19, 2020, White wrote to Plaintiffs and falsely encouraged Plaintiffs to launch the league as quickly as possible, notwithstanding Defendants' surreptitious cancellation of NEL's event dates." *Id.* at ¶ 92.

- Defendant MMG unilaterally cancelled events dates in January 2020 and did not notify Plaintiffs. *Id.* at ¶ 80.

- In January 2020, Defendants contacted USEF and requested that the NEL license be changed from National to MMG. *Id.* at ¶ 88.

- "By January 26, 2020, White and Morrissey were circulating a draft operating agreement for MLSJ" while fraudulently representing to Plaintiffs that they should continue working together on NEL. *Id.* at ¶¶ 98-100; *see also* ¶¶ 95, 99, 100, 105, 106, 108, 110, 111.

The Undersigned finds that Defendants have notice of the conduct complained of, and thus, they have sufficient information to formulate a defense. *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1294 (M.D. Fla. 2018) (citing *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006)) ("The purpose of Rule 9(b) is to ensure defendants have 'notice of the conduct complained of,' so they have 'sufficient information to formulate a defense.'"). Accordingly, the Undersigned finds that Defendants' motion to dismiss Count V should be denied.

### c.  Count VI – Negligent Misrepresentation Against MMG, Angelstone, Morrissey, and White

In Count VI, Plaintiffs' allegations in support of their negligent misrepresentation claim are almost identical to the allegations included in Plaintiffs' fraud count, except Plaintiffs allege that Defendants "intentionally, recklessly or negligently" made false statements. [ECF No. 45, ¶¶ 175-83].

The particularity requirement of Rule 9(b) also applies to negligent misrepresentation claims. *See Douse v. Bos. Sci. Corp.*, 314 F. Supp. 3d 1251, 1264 (M.D. Fla. 2018) (relying on *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014)) ("Negligent misrepresentation allegations are subject to Rule 9(b)'s heightened particularity standard.").

Defendant makes the same argument as it relates to Count V for Fraud -- that Plaintiffs do not meet the standard for Rule 9(b).

Accordingly, for the same reasons discussed above in Count V, the Undersigned finds that Defendants' motion to dismiss Count VI should be denied.

### d.  Count VIII – Conspiracy Against All Defendants

Plaintiffs allege in Count VIII that:

195. In or around December 2019, Defendants, by and through White and Morrisey, entered into an agreement to embark on an unlawful course of conduct to defraud Plaintiffs, commit tortious interference, misappropriate trade secrets, commit unfair business practices and to infringe copyrights by setting up the MLSJ.

196. In furtherance of this conspiracy, Morrisey and White, acting for themselves and on behalf of MMG, Angelstone and MLSJ committed overt acts, including, but not limited to cancelling dates for the NEL, contacting Plaintiffs for information, contacting, negotiating with and signing Plaintiffs' contacts and prospective business associates, using Plaintiffs' proprietary information, and by inducing Plaintiffs to rely on their fraudulent and false representations omissions, continue to share confidential information and business plans, and to erroneously rely on Morrissey, White, MMG and Angelstone to promote Plaintiffs' business interests.

197. Defendants have aided and abetted each other in these tortious acts. As a result of their conduct, conspiracy, and scheme, Defendants are jointly and severally liable for the damages sustained by Plaintiffs.

198. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages.

199. The conspiracy was formed intentionally, willfully, and with the purpose of harming Plaintiffs and benefitting Defendants. Consequently, Plaintiffs reserve the right to seek an award of punitive damages sufficient to punish Defendants and serve as a deterrent against such tortious and unlawful conduct at the appropriate time.

[ECF No. 45, ¶¶ 195-99].

"To state a claim for civil conspiracy under Florida law, a plaintiff must allege: '(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.'" *Corbett v. Transp. Sec. Admin.*, 968 F. Supp. 2d 1171, 1190 (S.D. Fla. 2012), aff'd, 568 F. App'x 690 (11th Cir. 2014) (citing *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009)).

23

Further, a claim for civil conspiracy must "set forth clear, positive, and specific allegations of civil conspiracy." *Corbett*, 986 F. Supp. 2d at 1190 (internal citation omitted); *see also Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1320 (S.D. Fla. 2014) (citing *Fullman v. Graddick*, 739 F.2d 553, 556 (11th Cir. 1984)) ("In . . . conspiracy actions, courts have recognized that more than mere conclusory notice pleading is required. . . In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed.").

And here, where Plaintiffs allege that Defendants have entered into an agreement to defraud Plaintiffs, "an underlying cause of action for fraud is a necessary predicate to a cause of action for conspiracy to defraud." *Alhassid.*, 60 F. Supp. 3d at 1316 (internal citation omitted).

Defendants argue that to the extent Plaintiffs' conspiracy claim is based on fraud, it should be dismissed for failure to comply with the particularity requirements of Rule 9(b). As discussed above, the Undersigned finds that Plaintiffs' fraud count is adequately pled.

Further, Plaintiffs' conspiracy count provides the who, what, when, where, and how of Defendants' alleged agreement. Plaintiffs allege that:

- In "December 2019, Morrissey and White began to plan to cut Plaintiffs out of the business and create their own league based on Plaintiffs' plans." [ECF No. 45, ¶ 83].

24

- White and Morrisey hid their plans and "agreed with each other to keep their own plans secret from Plaintiffs." *Id.* at ¶ 85.

- "On or about January 2, 2020, while keeping it secret from Plaintiffs, and claiming to represent Plaintiffs as their consultants and agents, Defendants caused the USEF to cancel event dates held by National." *Id.* at ¶ 87.

- In January 2020, they continued to develop MLSJ while agreeing to misrepresent to Plaintiffs [that] they were working together. *Id.* at ¶¶ 89-97.

Thus, the Undersigned finds that Defendants' motion to dismiss Count VIII should be denied.

### e.   Count XII – Unjust Enrichment Against All Defendants

Plaintiffs allege in Count XII that:

261. Plaintiffs have conferred a benefit on Defendants in the form of payments and their property, including the NEL plan, business plans, know how, their contacts, potential investors, managers, promoters, event dates and teams.

262. Defendants have knowingly and voluntarily received the benefits and value conferred by Plaintiffs and have voluntarily accepted and retained the benefits conferred.

263. It would be inequitable for Defendants to retain the benefits conferred by Plaintiffs.

264. Defendants would be unjustly enriched by retaining the benefit.

265. Plaintiffs have exhausted all direct remedies against any Defendants for which they are in privity of contract.

[ECF No. 45, ¶¶ 261-65].

The elements of an unjust enrichment claim are "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) (internal citation omitted).

Defendants argue that Plaintiffs' claim for unjust enrichment should be dismissed because Plaintiffs have not alleged a distinct equitable claim. Defendants state that Plaintiffs' unjust enrichment claim arises out of the relationship governed by the express agreements and concerns the same subject matter, and thus it must be dismissed. *See Alhassid v. Nationstar Mortg. LLC*, 771 F. App'x 965, 969 (11th Cir. 2019) (internal citation omitted) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.").

Plaintiffs point out that one of the Defendants, White, did not sign a contract. And additionally, Plaintiffs argue that they can plead their unjust enrichment claim in the alternative to their breach of contract claims, and it would therefore be premature to dismiss the unjust enrichment count now. *See Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1279 (S.D. Fla. 2009) ("However, Plaintiffs argue, and the Court agrees, that Federal Rule of Civil Procedure 8(d) allows pleading in the alternative, even if the

theories are inconsistent."). Additionally, Plaintiffs argue that the contracts do not cover the scope of the unjust enrichment claim.

The Undersigned agrees with Plaintiffs. Plaintiffs are permitted to plead unjust enrichment in the alternative. *See id.* And further, it appears that Plaintiffs' unjust enrichment claim derives from different facts than the unjust enrichment claim. *See Quantum Supply B.V. v. Mercury Air Cargo Inc.*, No. 20-CV-25223, 2021 WL 1125017, at *2 (S.D. Fla. Mar. 24, 2021) (internal citation omitted) ("One instance where a party may properly assert an alternative claim for unjust enrichment where a valid contract otherwise exists is when the quasi-contractual claims concern matters which are outside the scope of the contract.").

Here, while the contracts between Plaintiffs and MMG, Angelstone, and Morrissey may cover the fees they were paid as consultants, damages for the breach of those contracts may not fully compensate Plaintiffs for the loss of their entire business model and plan to create a novel equestrian event.

The Collaboration Agreement provides that Angelstone will act as a consultant to introduce Plaintiff NEL to qualified persons and that he would receive a percentage of the amount paid by the qualified person to NEL. The term sheet between MMG and JCC provides that MMG would provide specific services to JCC in connection with the NEL, including assisting with the business model and developing a strategic sponsorship plan. These contracts do not discuss what would happen if Defendants took the information

27

gained during the time they were acting as consultants and created their own league with it (and allegedly sabotaged Plaintiffs' league in the process).

Accordingly, the Undersigned finds that Defendants' motion to dismiss Count XII should be denied.

### f.  Defendants' Motion to Strike Damages Claims

#### i.  <u>Plaintiffs' Requests for Disgorgement of Profits in Breach of Contract Counts</u>

Plaintiffs previously stated, in their response to Defendants' initial motion to dismiss, that they would not seek disgorgement of profits in connection with their breach of contract counts at trial. [ECF No. 7, p. 18 (citing *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1245 n.26 (11th Cir. 2009) ("We have found no Florida authority suggesting that this principle permits disgorgement of profits in an ordinary breach of contract action.")]. Thus, Defendants have requested that this request be stricken from the ad damnum clauses of Plaintiffs' breach of contract counts.

Because this request for damages is legally unavailable (and Plaintiffs already conceded[4] that this type of damages is unavailable here), the Undersigned agrees with Defendants that it should be stricken. *See Church Girls, LLC v. Rodgers*, No. 2:18-CV-14232, 2018 WL 5923436, at *4 (S.D. Fla. Nov. 13, 2018) (internal citation omitted) ("While

---

[4]   Specifically, Plaintiffs explained that "it appears that disgorgement is not an available remedy for a non-real property breach of contract action" and represented that "absent further clarification of the law, Plaintiffs will not seek that requested relief for Counts II, III, and IV at trial." [ECF No. 7, p. 18].

granting a motion to strike is disfavored by courts, the purpose of a motion to strike is to clean up the pleadings, remove irrelevant or otherwise confusing materials, and avoid unnecessary forays into immaterial matters."); *see also Poindexter v. Zacharzewski*, No. 18-14155-CIV, 2018 WL 6182590, at *2 (S.D. Fla. Nov. 5, 2018), report and recommendation adopted, 2018 WL 6179482 (S.D. Fla. Nov. 27, 2018) (internal citation omitted) ("A motion to strike is the appropriate mechanism to pursue removal of the prayer for damages in the Complaint.").

ii.  <u>Request in Count XIII (Copyright Infringement) for Damages Other Than Actual Damages, Infringer Profits, and Costs</u>

In Count XIII, Plaintiffs request actual damages, statutory damages, and attorney's fees for Defendants' alleged copyright infringement of the Executive Summary, League Presentation, and Franchise Summary. Defendants move to strike Plaintiffs' request for statutory damages and attorney's fees because the alleged infringement of the Executive Summary, League Presentation, and Franchise Summary began before these copyrights were registered. *See* 17 U.S.C. § 412; *see also Rug Art Int'l, Inc. v. Galaxy Mktg., Inc.*, No. 11-60178-CIV, 2011 WL 13217291, at *2 (S.D. Fla. May 27, 2011) ("Accordingly, § 412 operates to foreclose Plaintiff's pursuit of either statutory damages or attorney's fees with respect to the "Calabasas" and "Tassels" designs, because they were registered after the alleged infringement.").

Defendants attach to their motion to dismiss a copy of the U.S. Copyright Office Registration Records reflecting that Plaintiffs obtained copyright registration of the

"League Presentation" and the "Executive Summary" on January 19, 2021, and on February 5, 2021 for the "Franchise Summary." [ECF No. 50-1]. Defendants' alleged infringements began at least thirteen months before a copyright was ever registered. Thus, Defendants can recover only actual damages, infringer profits, and costs related to the infringement. *See Rug Art Int'l, Inc.*, 2011 WL 13217291, at *2 (striking requests for statutory damages and attorney's fees when infringement occurred prior to date of registration).

Plaintiffs do not dispute this. They simply state that making this determination would require the Court to make factual findings as to the date of the infringement, which is not appropriate on a motion to strike. *See Miranda v. Wells Fargo Bank, N.A.*, 11-cv-20885-KMM, 2011 WL 13223667, at *1 (S.D. Fla. Sept. 29, 2011) (internal citation omitted) ("It is inappropriate to resolve disputed factual issues on a motion to strike.").

The Undersigned agrees with Defendants that no factual determination is necessary to strike the demands for statutory damages and fees because Plaintiffs allege the dates of infringement (beginning in late 2019 and early 2020) in the Amended Complaint. *See* ECF No. 45, pp. 11-12. And the Court may take judicial notice of the copyright records reflecting the date of registration. *See Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (internal citation omitted) ("The district court may take judicial notice of public records and may thus consider them on a motion to

dismiss."); *see also Pro. LED Lighting, Ltd. v. AAdyn Tech., LLC*, 88 F. Supp. 3d 1356, 1371 n.2 (S.D. Fla. 2015) (taking judicial notice of copyright registrations).

Accordingly, the Undersigned finds that the Court may properly take judicial notice of the copyright registration documents [ECF No. 50-1] and grant Defendants' motion to strike Plaintiffs' request in Count XIII (Copyright Infringement) for damages other than actual damages, infringer profits, and costs.

iii.   Plaintiffs' Request for Damages Other Than Actual Damages, Plus Attorney's Fees and Court Costs in Count XIV (FDUTPA)

Defendants move to strike the ad damnum clause of Count XIV to the extent Plaintiffs seek damages beyond those recoverable under FDUTPA. The Florida Deceptive and Unfair Trade Practices Act limits recovery to "actual damages, plus attorney's fees and court costs." § 501.211(2), Fla. Stat. "Actual damages" under FDUTPA "is a term of art, defined by Florida courts as the difference in market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999) (internal citation omitted).

Here, regarding Count XIV (FDUTPA):

Plaintiffs seek judgment for compensatory, consequential, and general damages in an amount to be determined at trial; disgorgement and restitutions of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts and practices; punitive damages, declaratory relief, attorneys' fees; costs and disbursements of the action; pre-and post-judgment interest; preliminary and permanent

31

injunctive relief, and such other and further relief as this Court may deem just and proper.

[ECF No. 45, p. 44].

Thus, the Undersigned finds that Plaintiffs' request for any damages other than "actual damages, plus attorney's fees and courts costs" should be stricken from the ad damnum clause of Count XIV.

## IV.    Conclusion

For the reasons discussed above, the Undersigned **respectfully recommends** that the District Court **deny in large part** Defendants' motion to dismiss Plaintiffs' amended complaint. Specifically, the Undersigned **respectfully recommends** that the District Court **deny** the motion to dismiss as to: Count I (copyright infringement), Count V (fraud), Count VI (negligent misrepresentation), Count VIII (conspiracy), Count XII (unjust enrichment), and Count XIII (copyright infringement). The Undersigned **respectfully recommends** that the District Court **grant** Defendants' motion to dismiss, as follows: (1) striking Plaintiffs' requests for disgorgement of profits in their breach of contract claims; (2) striking Plaintiffs' request for damages other than actual damages, infringer profits, and costs for copyright infringement in Count XIII; and (3) striking Plaintiffs' request for damages other than actual damages, plus attorney's fees and court costs for the FDUTPA claim.

Finally, in order to ensure that the parties will be proceeding on an easily-understood complaint, rather than one with sentences, clauses, and prayers for relief

stricken, the Undersigned further recommends (if these recommendations are adopted) that Plaintiffs file a cleaned-up Second Amended Complaint within seven days after an order adopting these recommendations is entered, and Defendants shall substantively answer all counts within seven days after service of the Second Amended Complaint.

## V.     Objections

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Federico A. Moreno. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on May 26, 2021.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**<u>Copies furnished to:</u>**
The Honorable Federico A. Moreno
All counsel of record