UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 20-21746-CIV-MORENO/GOODMAN

NATIONAL EQUESTRIAN LEAGUE, LLC, et al.,

      Plaintiffs,

v.

KEEAN WHITE, et al.,

      Defendants.

_____/

**ORDER[1] ON PLAINTIFFS' PURPORTED ATTORNEY-CLIENT PRIVILEGE
WITH ATTORNEY JAMES D. WHISENAND AND HIS LAW FIRM**

Plaintiffs have refused to produce 361 documents totaling 1,882 pages listed on

their privilege log, claiming that the materials are protected by the attorney-client

privilege with James D. Whisenand and his law firm.

---

[1]     This Order is based in part on factual information in a memorandum which
Defendants say they were required to file under seal because of Plaintiffs' designation of
large portions of James Whisenand's deposition and exhibits as privileged or
confidential. But, after reviewing the deposition, the Undersigned determined [ECF No.
120] that the material does not constitute confidential material.

Moreover, the proposed legal fee arrangement and emails discussing the
alternatives between Whisenand and Plaintiffs are not privileged. *See Soricelli v. GEICO
Indem. Co.*, No. 8:16-CV-1535-T-30TBM, 2017 WL 275967, at *4 (M.D. Fla. Jan. 20, 2017)
("Courts in this Circuit have concluded 'fee agreements or retainer agreements generally
are not privileged.'"); *Armor Screen Corp. v. Storm Catcher, Inc.*, No. 07-81091-Civ, 2009 WL
2767664, at *1 (S.D. Fla. Aug. 31, 2009) ("[T]he communication of factual information, such
as . . . fee agreements, and retainer agreements are generally not protected by the
attorney-client privilege.").

Plaintiffs maintain this position even though (1) Whisenand unequivocally represents (in a formal written submission filed in the case [ECF No. 122]) that neither he nor his law firm had an attorney-client relationship with Plaintiffs and/or their principals; (2) they twice rejected Whisenand's proposals to retain him as an attorney providing legal advice and opted to instead use him as a business consultant; (3) Whisenand's submission explains that Plaintiffs retained and compensated nine other active attorneys; (4) Whisenand represents that "no privileged legal advice was provided to Plaintiffs"; (5) Plaintiffs listed only five documents (out of the 361 on their privilege log) in their memorandum [ECF No. 118] which they say illustrate Whisenand's provision of legal advice; and (6) at best, only two of the five documents mention, albeit succinctly and in a conclusory way, legal concepts which could arguably be deemed legal advice -- but the context establishes that these isolated comments were primarily made in Whisenand's role as a business advisor who happens to also be an attorney.

As suggested by the factors outlined above, Plaintiffs have not met their burden of establishing the attorney-client privilege for any of the 361 documents on their privilege log. As a result, Plaintiffs shall produce them to Defendants within **three business days** of this Order.

I.     **Procedural and Factual Background**

In their Second Amended Complaint [ECF No. 61], Plaintiffs National Equestrian League, LLC ("National") and JumpingClash, S.L. ("JC") assert claims for damages and

injunctive relief against Defendants Matthew Morrissey, Keean White, Angelstone Farms, Inc., Morrisey Management Group, LLC, and Major League Show Jumping LLC.

The case concerns the parties' efforts to develop and launch a professional horse jumping league.

According to Plaintiffs, they were supposed to be working with Defendants to develop the league, but Defendants had been secretly working to form their own league and had misappropriated Plaintiffs' trade secrets and prospects. Plaintiffs contend that Defendants worked to steal a plan to develop the league; worked to use Plaintiffs' confidential information, regulatory knowhow, and business plans; schemed to infringe copyrights belonging to one Plaintiff; and ultimately engaged in this misconduct in order to set up their own league.

Plaintiffs assert claims for copyright infringement, breach of contract (three counts against different defendants), fraud, negligent misrepresentation, tortious interference, conspiracy, breach of fiduciary duty, theft of trade secrets (two counts), unjust enrichment, copyright infringement, and unfair business practices.

Defendants answered [ECF No. 70] the Second Amended Complaint, asserted affirmative defenses and raised Counterclaims. Defendant Angelstone contends that Plaintiff National never paid the full amount due under a consultant agreement. Defendant Angelstone asserts claims for declaratory relief, breach of contract (two counts), and breach of the implied covenant of good faith and fair dealing, and tortious

interference (against Plaintiff JC). In response, Plaintiffs/Counter-Defendants filed [ECF No. 73] a motion to dismiss counterclaims and to strike affirmative defenses.

The parties have had several discovery disputes in this case, including the instant one involving Plaintiffs' invocation of the attorney-client privilege over communications with Whisenand and his law firm. Plaintiffs have filed [ECF No. 95] the purportedly privileged documents under seal. The parties filed memoranda on the attorney-client privilege issue [ECF Nos. 116; 117; 118] after the Undersigned received information at a hearing and then pinpointed [ECF No. 98] specific issues to be addressed.

Defendants filed both a sealed unredacted version of their memorandum [ECF No. 116] and a publicly-filed redacted version of the same memorandum [ECF No. 117]. Defendants attached as an exhibit Plaintiffs' Amended Privilege Log [ECF Nos. 116-1; 117-1]. Plaintiffs filed on CM/ECF a memorandum [ECF No. 118] and filed under seal [ECF No. 119-1] a copy of an April 24, 2019 "Term Sheet & National Equestrian League Arrangement" between JC and Equus & Co. ("Equus"), an entity formed approximately 15-20 years ago to engage in equestrian business activities (in which Whisenand is the manager).

In addition, Whisenand, a non-party who received a subpoena in the case several months ago, filed what he deemed "additional source information" to "assist the Court" with the issues flagged in the Order establishing a briefing schedule. [ECF Nos. 121; 122]. Whisenand filed both an unredacted [ECF No. 122] and a redacted [ECF No. 121] version

of the additional source information. He also explained that he provided Plaintiffs' counsel with both a redacted and an unredacted copy of the additional source information but provided Defendants' counsel with only a redacted copy. Whisenand explained that this was "done out of an abundance of caution pending the Court's determination [of the attorney-client privilege issue]." [ECF No. 121, p. 1].

Daniel Entrecanales, Luis Estrada, and Pablo Marquez are the non-attorney principals of Plaintiff JumpingClash and, along with Whisenand, are board members in Plaintiff National Equestrian League, LLC. The communications at issue are either between Whisenand and the other three or are communications among Plaintiffs' principals.

Whisenand, an attorney at Whisenand & Turner, P.A., has been involved in equestrian sports since he was eight. Whisenand is also involved in several businesses, including Equus.

a. Initial Solicitation

In 2017, Estrada contacted Whisenand about Equus partnering with JC to develop the National Equestrian League ("NEL"). Estrada ran polo operations for the Santa Maria Polo Club in Sotogrande, Spain; he and Whisenand "had done quite a bit of business together" and were friends. [ECF No. 93-1, 16:18-20; 29:23-24]. Whisenand stated:

> He [Estrada] asked me if I would be interested in – in working with JumpingClash through Equus & Co. Matter of fact, specifically, he said he wanted Equus & Co. to do it, to – to trade the National Equestrian League in . . . North America.

5

*Id.* at 16:22-25; 17:1-2.

Whisenand was recruited to get involved with NEL because of his knowledge and expertise in equestrian sports. *Id.* at 25:12-17. Estrada contacted him in February 2019 to be a "potential equity partner[]," seeking Whisenand's assistance to "creat[e] an initial list of potential investors" and to provide his "opinion on the Sales Book" for the NEL. [ECF No. 116-4].

    b.  <u>Plaintiffs **Reject** Proposed Attorney-Client Relationship</u>

In March 2019, Whisenand proposed alternatives for participating with JC in the NEL. (NEL LLC is a Delaware LLC that was not formed until June 4, 2019). [ECF No. 116-5].

Alternative 1 included performing "NEL legal work" with compensation "at 50% of normal cha[r]ges." *Id.* Alternative 2 was for performing no legal work; only identifying potential investors and assisting NEL LLC with investments. *Id.* After discussing the proposals with Entrecanales and Marquez, Estrada advised Whisenand that: "they can't afford the regular fees you are proposing" "[s]o ***the commitment they propose for the moment is the Alternative 2* . . . ." *Id.* (emphasis supplied). Whisenand confirmed that JC "prefers a simple arrangement only for limited current activities" as set forth in Alternative 2. Entrecanales, the majority owner and CEO of JC, commented on Whisenand's "NEL Proposal" and never expressed an intent to retain Whisenand or his firm for legal advice. [ECF Nos. 93-1, 19:14-17; 116-6].

In November 2019, after Equus and JC entered into the Term Sheet described below and "[w]hen nothing was getting done with respect to the agreements" that NEL LLC needed, Whisenand *again* proposed that he and/or his law firm provide legal services. [ECF No. 93-1, 275:3-5]. The proposed "legal fee arrangement," which Plaintiffs did not produce, appears to have been delivered by Whisenand on November 1, 2019, as reflected in entry PRIV 250 on [ECF No. 116-1]. Whisenand's second proposal was also rejected.

Therefore, on at least two occasions, Whisenand proposed providing legal services to Plaintiffs and each time his proposal ***was rejected***. Whisenand explained the status at his deposition:

> [T]he proposal to provide – Whisenand & Turner to provide legal advice to [JC] or [NEL LLC] was expressly rejected by Daniel Entrecanales in April 2019.… When nothing was getting done with respect to the agreements in November of 2019, a second proposal was made. It was rejected, and [JC] and [NEL] then used Mazars, Emilio Prieto . . . and another unnamed law firm, and Lisa Lazarus.

[ECF No. 93-1, 274:21-275:9].

Neither JC nor NEL LLC ever executed an engagement agreement with Whisenand as a lawyer or with his law firm. Other than a recent declaration of Entrecanales filed by Plaintiffs [ECF No. 118-2], not a single document reflects an intent to retain Whisenand for legal work. The declaration, of course, is not a business document, such as a retainer agreement or wire transfer of a retainer. Instead, it is a post-

lawsuit submission filed in connection with Plaintiffs' efforts to keep secret a substantial amount of documents by asserting the attorney-client privilege.

Entrecanales' two-page declaration is conclusory and lacks specific detail. Significantly, it does not discuss (or even mention at all) the rejected proposals for legal services. The only portions in which Whisenand's purported role as attorney are discussed are paragraphs 10 through 12, which are quoted below in their entirety:

> 10. Mr. Whisenand used his firm's resources, including the lawyers in his firm, to provide legal advice and draft legal documents for JC and NEL.
>
> 11. For example, Mr. Whisenand provided legal advice, as well as research and drafting with regard to a unique legal issue. He also provided legal advice with respect to franchise law requirements, securities laws, disability compliance and potential litigation positions and strategies. However, this is by no means an exhaustive list of the various matters upon which he provided legal advice to my companies.
>
> 12. Throughout our relationship with Mr. Whisenand, it was my understanding that he was our attorney, and that we therefore maintained a privileged and confidential relationship.

[ECF No. 118-2].

The declaration does not explain **why** he purportedly had the understanding that Whisenand was their attorney. Given the two alternatives for providing legal services (which were rejected) and the one for business consulting services (which was accepted), this omission is significant for what it does *not* say.

c.  The Equus-JC Term Sheet Does Not Contemplate Legal Services

On April 24, 2019, consistent with the emails regarding the "Alternative 2" role in the NEL, JC and Equus entered into a "Term Sheet & National Equestrian League Arrangement." [ECF No. 116-7]. The "National Equestrian League Summary" at the beginning makes clear that JC "has engaged ***Equus . . . and its Manager James D. Whisenand . . . to provide defined advisory services*** to [JC] and advisory services to the NEL Company." *Id.* (emphasis supplied). The section titled "Advisor Arrangement" details the advisory services that Equus would provide in return for a 5% ownership interest in the NEL and a 3% fee for any NEL investor identified by Equus. *Id.* No reference is made to providing legal services (presumably because the proposal including legal services was rejected).

The Term Sheet "exclusively" defined Whisenand's relationship with JC. [ECF No. 93-1, 22:22-25]. He executed it as Manager-Authorized Representative of Equus, not individually or on behalf of his law firm. [ECF No. 116-7]. When Estrada forwarded JC's executed Term Sheet to Whisenand, Estrada noted that they would refer to him on the NEL website as "Senior Business Advisor." [ECF No. 116-6]. Whisenand understood that the exclusive purpose of Equus' and his involvement with JC and the NEL was to provide business advice, not legal services. [ECF No. 93-1, 23:15-24:6].

Even though Whisenand had no contractual relationship with JC until April 24, 2019, and NEL LLC did not exist until June 4, 2019, Plaintiffs have withheld as privileged numerous communications with him before that time. [ECF No. 116-1].

d. <u>Plaintiffs Represented to Whisenand They Were Using Independent Counsel</u>

Having rejected Whisenand's proposals to provide legal services, JC advised Whisenand that its lawyers would prepare necessary documents for the NEL. At one point, Estrada sent Whisenand a partial/incomplete team document drafted by Lisa Lazarus, a lawyer for JC. [ECF No. 93-1, 65:6-9; 126:15-127:10]. Whisenand then had Equus prepare documents because JC was not fulfilling its obligations, and he sent those drafts to Estrada for review by JC's lawyers:

> [I]n November 2019 they said a Mazars law firm was reviewing it for them, and then a couple weeks later they weren't using Mazars anymore. They were using another law firm, and – and I don't know who they – who they switched law firms to. Prior to that, JumpingClash was using a gentleman called Emilio Prieto. Also was a lawyer in Madrid, as I understand it.
>
> ***
>
> [S]ince nothing had been done, Equus created a set of documents and sent them to – to—matter of fact, sent them to JumpingClash, to Luis Estrada, Pablo and Daniel. And Equus asked Luis to – to take them to Jumping Clash's lawyers, have them reviewed, and to agree on them and sign them.
>
> There was a delay in – in responding, and then I was told that they were going … to decide which law firm, because they used many. And they then said they were going to go to Mazars and Mazars would do it. They said they were busy, and it would take a little while. And then they said they decided not to use Mazars anymore, and they were going to use another law firm. I never received a name on that one. And – and – any rate, I never got a response, and then it was Madrid Horse Week, and nothing happened.

*Id.* at 34:5-15; 97:17-98:8.

According to Whisenand's deposition testimony, to the extent that Whisenand & Turner lawyers drafted any documents, they did so on behalf of and for Equus and then communicated with JC's counsel. *Id.* at 276:13-278:9.

e. <u>Plaintiffs' Efforts to Shield Evidence From NEL LLC Minority Partner-Whisenand</u>

As early as July 2019, Equus "became aware of things relating to the ownership of [JC], and . . . objected." *Id.* at 276:7-12. Whisenand had become "very frustrated" that the NEL "was not going at the speed and with the definition, and with the objective completed that it needed to go to succeed." *Id.* at 156:21-25. The Log reflects the withholding of numerous non-attorney communications in June and July 2019. [ECF No. 116-1].

By September 2019, there was not even a "rough signed-off business plan" for the NEL, yet Entrecanales wanted Whisenand to solicit investors. [ECF No. 93-1, 147:13-148:25]. Whisenand refused, telling Entrecanales, Marquez, and Estrada that it would cause the project to lose all credibility since "we can't even tell [investors] how much money we want" or "what they get for their money." *Id.*

By October 2019, Entrecanales had decided to cancel the NEL's 2021 inaugural season. *Id.* at 98:9-14. After three "quite frustrating" trips to Spain, with no critical documents prepared or decisions made, Whisenand declined to attend a final meeting in Madrid in December 2019. *Id.* at 88:4-89:23.

Plaintiffs severed their relationships with Morrissey, MMG, White, and Angelstone in mid-December 2019 and the NEL was near death, and the conflict between Whisenand and his business partners grew. Whisenand believed White had performed his rider/team solicitation work with "incredible speed" and had done "extraordinary," "exceptional" work despite not having "the proper resources," i.e., NEL team documents. *Id.* at 84:1-85:2; 86:13-15. Whisenand "believed [White] was being incorrectly treated" because he "had produced extraordinary results" and "fulfilled his obligations under the contract." *Id.* at 117:14-118:9. On December 16, 2019, after Marquez and Estrada called White and Morrissey to cancel their contracts, Whisenand expressed concerns about the "potential conflict" with White to his partners and they discussed Whisenand's views. [ECF No. 116-1].

When White e-mailed Estrada on December 28, 2019, noting that he had fulfilled his obligations, was owed more than $1.6 million (and potentially over $2 million), and sought a resolution, Whisenand agreed. [ECF No. 116-9]. Whisenand told White that he did not agree that JC could disregard its contractual obligations. [ECF No. 93-1, 116:19-117:12]. Whisenand told Entrecanales, Marquez, and Estrada the same, and they had stopped responding to him by January 1, 2020. *Id.* at 117:12-13; 126:2-9. Plaintiffs, under a claim of attorney-client privilege, are withholding a December 29, 2019 e-mail between the non-attorneys discussing Whisenand's view that they owed White money, an email that is the subject of the September 7, 2021 hearing. [ECF Nos. 116-2; 112].

With Whisenand supporting White's claim to more than $1 million in commissions, Entrecanales and JC enlisted their own lawyer, Emilio Prieto, and his colleagues. [ECF No. 116-1]. By January 9, 2020, the non-attorneys were discussing their "potential dispute with James Whisenand." *Id.* Notwithstanding the then manifestly adverse interests between these business partners, Plaintiffs have withheld subsequent Whisenand-related communications. *Id.*

## II.  Applicable Legal Principles and Analysis

The Second Amended Complaint alleges subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and also alleges federal supplemental jurisdiction under 28 U.S.C. § 1367.

Under the Federal Rules of Evidence, federal common law governs the attorney-client privilege. Fed. R. Evid. 501. "But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." *Id.* Thus, "[f]ederal common law applies to attorney client privilege claims (or defenses) arising under federal law, whereas a state's evidentiary privilege applies in diversity cases." *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Attorneys, P.A.*, 519 F. Supp. 3d 1184, 1196 (S.D. Fla. 2021).

Where the plaintiff's complaint asserts a federal question as well as Florida state law claims, "federal common law applies to the federal claim[s] and Florida law applies to the state law claims." *Id*. However, [a]s a practical matter . . . there is no material

13

distinction between the attorney-client privilege available under Florida state law and federal common law." *Id.*

The "Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 580 (S.D. Fla. 2013) (quoting *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985)). Because the attorney-client privilege "serves to obscure the truth, . . . it should be construed as narrowly as possible consistent with its purpose." *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990).

The burden to sustain a privilege is a heavy one. *Diamond Resorts U.S. Collection Dev.*, 519 F. Supp. 3d at 1196.

As the invoking parties, Plaintiffs have "the burden of proving that an attorney-client relationship existed and that the particular communications were confidential" by a preponderance of evidence. *See id.* at 1197-98 (internal quotations and citations omitted). The purportedly protected communication must have been "made **for the purpose of** securing legal advice." *Id.* at 1197 (quoting *In re Grand Jury Matter No. 91-01386*, 969 F.2d 995, 997 (11th Cir. 1992)).

"[E]ach essential element of the privilege [must be] present with respect to the specific communication or document whose disclosure is sought." *Id.* at 1198 (internal citations omitted). A privilege log is the first step and "should be supported by affidavit or other evidence identifying each document or communication claimed to be protected

by the privilege and setting forth sufficient facts to allow a judicial determination as to whether the particular communication or document is, in fact, privileged." *Id.* (internal citations omitted).

Based on the record evidence, Plaintiffs have not established an attorney-client relationship with Whisenand or his firm. Not only is there no engagement agreement or written retainer agreement, but Plaintiffs also twice explicitly rejected Whisenand's proposal to retain him and his firm for purposes of providing legal advice.

At bottom, Plaintiffs have not established the "subjective but reasonable belief" test articulated in *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1281-83 (11th Cir. 2004). While a "formal retainer agreement" is not necessary to establish an attorney-client relationship, the test "is a subjective one and hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention is to seek professional legal advice." *Id.* at 1281. "This subjective belief **must be a reasonable one**." *Id.* (emphasis supplied) (quoting *Bartholomew v. Bartholomew*, 611 So. 2d 85, 86 (Fla. 2d DCA 1992)) (cleaned up).

For belief of an attorney-client relationship to be reasonable, the client must have "***consulted*** the attorney with the ***manifested intention*** of retaining him for legal services." *Jackson*, 372 F.3d at 1282 (emphasis in original). *Jackson* noted that "[t]he plain meaning of 'manifest' is 'to show plainly,' and . . . it is ***the lawyer being charged with representing a***

15

*client who must have been plainly shown the client's intention to form the attorney-client relationship.*" *Id.* at 1282 n.30.

Other than a succinct and conclusory declaration, there is no evidence to establish that Plaintiffs plainly showed Whisenand that they had an intention to form an attorney-client relationship. As outlined above, Whisenand repeatedly and unequivocally denies ever having an attorney-client relationship with Plaintiffs. Given that Plaintiffs twice rejected offers to have Whisenand provide legal services and advised Whisenand that their own attorneys were performing legal work, Whisenand had no reason to know that Plaintiffs believed he or his firm had been retained, or that Plaintiffs retained him or his firm (assuming that actually occurred at the time) without expressly advising him.

Plaintiffs cannot have secretly and privately retained Whisenand and his firm. In order to establish the attorney-client privilege under Florida law, they must show that Whisenand knew or had reason to know "that the putative client has sought a relationship." *Jackson*, 372 F.3d at 1282, n.31. They have not done so.

Plaintiffs point to only five documents which they say are proof that Whisenand was providing legal advice. The Undersigned is not convinced. To the contrary, those five documents reflect Whisenand's status as primarily a business consultant who happened to be an attorney, as opposed to an attorney exchanging communications whose primary purpose was to provide legal advice.

16

"[A] communication is not necessarily privileged simply because a lawyer is copied"; the proponent of privilege protections must show that "the primary purpose of the communication was to relay, request, or transmit legal advice." *Burrow v. Forjas Taurus S.A.*, 334 F. Supp. 3d 1222, 1236 (S.D. Fla. 2018); *see also Havana Docks Corp. v. Carnival Corp.*, No. 19-CV-21724, 2021 WL 2940244, at *4 (S.D. Fla. July 13, 2021) ("When a corporation claims attorney-client privilege for its communications with its in-house counsel, courts expect the company to demonstrate that the primary purpose for the communication was legal advice.").

Non-legal business advice is not privileged. *Burrow*, 334 F. Supp. 3d at 1236 (internal quotations and citation omitted).

Phrased differently, "an attorney who acts as his client's business advisor . . . is not acting in a legal capacity, and records of such transactions are not privileged." *United States v. Davis*, 636 F.2d 1028, 1044 (5th Cir. Unit A, Feb. 12, 1981).[2]

Further, "mixed purpose communications" reflecting both legal **and** business considerations are not privileged. *In re Seroquel Prods. Liability Litig.*, No. 06-md-1769-ORL-22DAB, 2008 WL 1995058, at *8 (M.D. Fla. May 7, 2008).

---

[2]     In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981), the newly-formed Eleventh Circuit Court of Appeals held that all decisions of the Fifth Circuit Court of Appeals as that court existed on September 30, 1981, would be binding as precedent in the newly-formed Eleventh Circuit. Therefore, this February 12, 1981 decision of the former Fifth Circuit is considered Eleventh Circuit law.

Moreover, "[t]he nature of email has complicated this task [of determining the predominant purpose of the communication]; email has made it so convenient to copy legal counsel on every communication that might be seen as having some legal significance at some time, regardless of whether it is ripe for legal analysis." *Havana Docks*, 2021 WL 2940244, at \*4 (internal quotations and citation omitted); *see also United States v. Halifax Hosp. Med. Ctr*, No. 6:09-cv-1002, 2012 WL 5415108 at \*2 (M.D. Fla. Nov. 6, 2012) (listing, as an element of the attorney-client privilege, "legal advice or assistance (**as opposed to business** or personal **advice**) that was the primary purpose of the communication" (emphasis added)).

The mere fact that Whisenand *offered* to provide legal services does not render his communications subject to the attorney-client privilege. But even if his twice-rejected proposal to provide legal services was accepted (a scenario the record evidence does not support), the business-focused advice he provided would not be privileged unless the legal portion predominated. *See generally Carpenter v. Mohawk Indus., Inc.*, No. 4:07-CV-0049-HLM, 2007 WL 5971741, \*9 (N.D. Ga. Oct. 1, 2007) ("Attorney-client communications concerning business matters are not within the attorney-client privilege. . . . When advice given by an attorney relates to both business and legal matters, the legal advice must predominate in order for the attorney-client privilege to apply. . . . [T]he party asserting the attorney-client privilege bears the burden of showing that the attorney acted in his or her capacity as a legal advisor[ ].").

18

Plaintiffs must assert the attorney-client privilege on a document-by-document basis. *In re Grand Jury Subpoena*, 831 F.2d 225, 227 (11th Cir. 1987). Thus, a party cannot meet its burden of proof with a blanket assertion of privilege. *Id.*

The five documents Plaintiffs discuss in their submission are not subject to the attorney-client privilege. Plaintiffs' description of the documents does not control. Therefore, the mere fact that Plaintiffs say that some documents (e.g., priv 087, priv 102) are "opinion letters" does not automatically make them privileged. As it turns out, most of the five documents are not subject to the attorney-client privilege (even if Whisenand and his firm were Plaintiffs' attorneys, which they were not) because the primary purpose was to discuss business issues. As for the document designated priv 129, which does provide some succinct law-related comments about a website's ADA compliance, Whisenand and his firm were not retained as counsel to provide legal advice and the discussion was still provided in his role as business advisor.

Because Whisenand did not have an attorney-client relationship with either Plaintiff, and the purpose of his communications with Entrecanales, Marquez, and Estrada was to provide business consulting services (but not to provide legal advice), there is no attorney-client privilege protecting Whisenand's communications. Therefore, any communications between the non-attorneys about Whisenand's business advice is not privileged either.

19

Documents prepared by non-attorneys and provided to non-attorneys, even if copies are sent to attorneys, which is not the case with this category of documents listed on Plaintiffs' privilege log, "are generally not privileged since they are not communications made primarily for legal advice." *Loftin v. Bande*, 258 F.R.D. 31, 34 (D.D.C. 2009).

Plaintiffs' privilege log vaguely describes the communications between the non-attorneys as "discussing legal advice provided by attorney," without specificity as to the advice or when it was provided. This is inadequate. *See Hynix Semiconductor, Inc. v. Rambus Inc.*, No. CV-00-20905, 2008 WL 350641, at *3 (N.D. Cal. Feb. 2, 2008) ("A vague declaration that states only that the document 'reflects' an attorney's advice is insufficient to demonstrate that the documents should be found privileged.").

Moreover, some of the comments are in Spanish and have not been translated, so Plaintiffs did not meet their burden for these untranslated comments in the email communications between the non-attorneys. [*See, e.g.,* ECF No. 95-1, priv 035, p. 130 of 915].

III.   <u>Conclusion</u>

Plaintiffs have not sustained their burden, and the Undersigned therefore overrules their attorney-client privilege claims to their communications with Whisenand (and his law firm) and the non-attorney communications on the Plaintiffs' Amended

20

Privilege Log and Redaction Log. Plaintiffs shall produce to Defendants these written

materials within three business days of the date of this Order.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on October 7, 2021.

_____

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All counsel of record